"The **COMMISSIONERS OF BELLE-FONTE**", a municipal corporation of the State of Delaware, Plaintiff Below, Appellant,

v.

Michele P. **COPPOLA**, Jr., and Ramona Coppola, his wife, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Oct. 12, 1982.

Decided: Nov. 17, 1982.

Herman Cohen, Cohen & Cohen, Wilmington, for plaintiff below, appellant.

Laurence Levinson, Wilmington, for defendants below, appellees.

Before HERRMANN, C.J., McNEILLY, QUILLEN, HORSEY and MOORE, JJ., constituting the Court en Banc.

MOORE, Justice:

This appeal from a decision of the Court of Chancery, denying the Town of Bellefonte's application to enjoin the operation of defendants' golf club repair business, conducted in the basement of their house, presents us with an interpretation of the term "customary home occupation" as it appears in a zoning ordinance regulating commercial activities in a residential district. Following original submission to a panel upon the briefs, we heard the matter en Banc to determine whether we should overrule certain statements on the subject of "customary home occupation" appearing in *Westminster Presbyterian Church v. Turner,* Del.Supr., 343 A.2d 604, 606 (1975).[1]

In his letter opinion denying relief, the Chancellor held that Bellefonte had failed to establish the defendants' activities were of a type not customarily carried on in the home, as opposed to a specific home occupation or business that is customarily carried on in the Town of Bellefonte.

We agree with that conclusion and thus overrule any contrary statements of this Court found in *Westminster Presbyterian Church v. Turner,* 343 A.2d at 606. Since the town relied on *Westminster,*

---

1. Rule 4(d) of this Court provides in pertinent part:

"... in the event that there is a reasonable likelihood that a prior decision of the Court may be modified or overruled ... the case shall thereupon be scheduled ... for rehearing and determination by the Court en Banc ..."

which may account for its failure of proof, the matter will be remanded to the Court of Chancery to permit the plaintiffs to meet the issue of "customary home occupation" based on the standards we herein adopt.

## I.

The Town of Bellefonte, located in northern Delaware, is a small, well-established community of approximately 1,500 persons. It takes pride in its long-standing policy of preserving three distinct areas within its borders for residential, apartment, and business uses. In 1947 it enacted a building zone ordinance which provides in pertinent part:

SECTION 3. RESIDENCE DISTRICT AND APARTMENT DISTRICT USES

Within any Residence District, no building, structure or premises shall be used or designed or arranged to be used, in any part, unless as hereinafter specified, otherwise than for the following six classes of purposes:

(a) One dwelling for not more than one family.

\*   \*   \*   \*   \*   \*

(d) Customary home occupation, such as dressmaking or millinery, conducted by a resident occupant with the assistance of not more than an average of two employees; provided there be no exterior advertising or display of goods; and provided further that any such occupation be not conducted in any accessory building.

\*   \*   \*   \*   \*   \*

(f) Accessory uses, customary with or incidental to any of the aforesaid permitted uses, including private garages as hereinafter specified; ...

The defendants, Michele P. Coppola and his wife, Ramona, have lived in Bellefonte's residence district since they bought their present house in 1972, and where they are now raising three children. Initially, Mr. Coppola was employed in a shop that sold golfing items and supplies. Later, he worked for a small company manufacturing specialized golf clubs. Upon leaving this job in 1978 Mr. Coppola was unemployed.

He then began the present golf club repair business which has sparked this litigation. According to the Coppolas' testimony, it is his sole occupation.

Essentially, this business is a highly specialized and limited form of woodworking or carpentry, which involves refinishing the head of a golf club or replacing a broken shaft, and occasionally assembling a specialized club by adding a shaft to a new club head. In this work Mr. Coppola uses a vice, a small bench-drill press, a hand drill, and assorted hand tools. There are no other employees, although Mrs. Coppola evidently acts as bookkeeper. When suit was filed in 1981, Mr. Coppola's customary charges were approximately $10 for replacing a shaft and $7 for refinishing a golf club head.

Generally, this work is confined to jobs sent to Mr. Coppola by golf professionals employed at several golf and country clubs in Delaware and nearby Pennsylvania and New Jersey who pay Coppola directly for his services. Rarely is this work performed or arranged by direct contact between Coppola and an individual golfer. There is no sign of any sort on the Coppolas' house, and all advertising is essentially by word of mouth. Coppola distributes a business card to golf club professionals, but he does not give them extra cards to circularize their customers. This card contains Coppola's trade name, "Golf Club Craftsman Repairs Unlimited", and his own name, address, and telephone number. Usually the work is brought to the Coppolas' house either by the golf professionals or their assistants, and it is on this point, because of alleged traffic problems, that many of the town's complaints and this controversy center.

The issues were presented to the Chancellor on a paper record consisting of the town's unsworn Complaint, the Coppolas' Answer, a stipulation of facts, the affidavits of six town residents, some of whom were the Coppolas' immediate neighbors, and the depositions of Mr. and Mrs. Coppola.

The complaint fails to allege that defendants' activities are not a "customary home occupation" either by the standards of Bel-

lefonte or by commercial standards generally. While the Coppolas did not file any affidavits on their behalf, the six presented by the town largely focused on traffic problems created around the Coppola house, and all of them charged that no other golf club repair business exists in Bellefonte, much less in its residence district. However, no evidence was presented that woodworking or specialized carpentry work is not performed in the Bellefonte residence district or generally as a customary home occupation.

In ruling for the Coppolas the Chancellor found that there is a distinction between the "nature" of defendants' business and the "manner" in which it is carried out. He correctly noted that the latter may be enjoined on theories wholly apart from the town's building zone ordinance.

The Chancellor decided that the term "customary home occupation" within the meaning of Bellefonte's building zone ordinance refers to a type of occupation or business that is customarily carried on in the home, not a specific occupation or business customarily carried on in a particular development, neighborhood or community where the homeowner lives. We agree with that conclusion and thus find ourselves in conflict with the following statement in the footnote of *Westminster*, 343 A.2d at 606:

"... in a specific community a given activity may be a customary home occupation while in other communities it may not be."

## II.

In approaching this problem we first note a material distinction between the procedural posture of this case and that of *Westminster*. Here, we deal with an injunctive action brought by Bellefonte to halt an alleged violation of its building zone ordinance. Thus, Bellefonte had the burden of proving its entitlement to an injunction

based on the meaning of the term "customary home occupation". The Chancellor held that it failed in such proof.

In *Westminster* the issues arose quite another way. There, a zoning variance had been sought to operate a hairdressing business in a Wilmington residential district. The Board of Adjustment of the City of Wilmington granted the variance and certain neighborhood objectors ultimately appealed that ruling to this Court.[2] Thus, in *Westminster* the burden was on the person seeking to operate a business as a "customary home occupation" to prove it was of that type, while here the burden was on the town to establish otherwise.

Bellefonte argues that since there is no other golf club repair business in the town, it has furnished the necessary proof under *Westminster* that the Coppolas' business is not a "customary home occupation". Thus, Bellefonte seeks to reverse the Chancellor's conclusions on the ground that they disregard the factual determination mandated by *Westminster*, i.e., whether a business operated in a specific community is by the standards of that area a "customary home occupation".

## III.

Bellefonte quite properly relied on *Westminster*, but that case can lead to paradoxical results which would wholly subvert the exceptions created and intended by Bellefonte's own zoning ordinance. Clearly, certain commercial activities under very limited conditions are specifically permitted in the Bellefonte residence district "such as dressmaking or millinery", but the town argues, unless by the standards of *Westminster* there are others in Bellefonte engaged in "dressmaking or millinery", no one may start such a business there.

This would mean that the plain words of the ordinance signify nothing. To give effect to that interpretation places this Court in the position of violating a cardinal princi-

---

**2.** The Wilmington zoning ordinance involved in *Westminster* is virtually identical to Bellefonte's in its permitted exception relating to a "[c]ustomary home occupation, such as milli-

nery or dressmaking ...". See 343 A.2d at 605. Indeed, Bellefonte states that its ordinance was taken from Wilmington's.

ple of statutory construction, i.e., a statute will not be construed so as to require an absurd or unreasonable result. We recognize that such an outcome is partially a consequence of this Court's statement in *Westminster,* which leads to our conclusion that it must be corrected. In doing so we approach the matter from two aspects: 1) the nature of the occupation in question and 2) the geographical scope upon which the "customary" nature of any activity, as a "home occupation", shall be determined.

▪ First, it is axiomatic that an injunction is not granted as a matter of course but must be earned. Thus, the plaintiff has the burden of proof and must show by a preponderance of the evidence that the Coppolas' activities are not a "customary home occupation" within the meaning of Section 3, *supra,* of the town's building zoning ordinance. In doing so, the basic or generic nature of defendants' business, rather than any commercial label applied to it, must govern. Therefore, the focus should be on the generic aspects of woodworking, carpentry, or the like, and whether such activities are a recognized "customary home occupation". Moreover, in terms of this work being "customary", the Court of Chancery may inquire whether such activities are incident to the use of the premises as a dwelling place and not one in which the use of the premises as a dwelling place is largely incidental to the occupation carried on. 1 E.C. Yokley, Zoning Law and Practice, § 4–26, at 186 (3d ed. 1965).

This leads to the second matter for the trial court's attention—the geographical scope within which the "customary" nature of such activities is to be determined. Clearly, if the Court of Chancery is satisfied that defendants' generic work is a customary home occupation in Bellefonte, then the inquiry is over. But the Court may look beyond the town's borders. Thus, it has been stated: "Sensitivity toward prior community experience need not, however, translate into an absolute requirement that an accessory use be common in the area and universally considered unobjectionable." Smith, *Zoning: Accessory Uses and The*

*Meaning of the "Customary" Requirement,* 56 B.U.L.Rev. 542, 549 (1976).

▪ Delaware is a small state of approximately 600,000 people, and many cases dealing with the question of what is "customary" arose in communities that are several times the size of Delaware in terms of population. Compare *Boreth v. Philadelphia Zoning Board of Adjustment,* Pa.Supr., 396 Pa. 82, 151 A.2d 474 (1959), and cases cited in Annot., 73 A.L.R.2d 436 (1960). Therefore, it is difficult to develop a "community" standard unless it can be fairly measured, particularly when it is the intent of Bellefonte's zoning ordinance to permit certain home occupations that are "customary". By providing for customary home occupations it is the obvious legislative intent that such activities are reasonable, appropriate and in the interest of the community as a whole. In our State, we believe the fair way to give meaningful effect to that clear intent in the context of these issues is by reference to that which is done on a state-wide basis. Broad geographical scopes have been recognized elsewhere to a degree both equal to and greater than that established here so that innovative land uses would not be foreclosed. *In re Lord,* Pa.Supr., 368 Pa. 121, 81 A.2d 533, 536 (1951); *Schantz v. Rachlin,* N.J.Super.Ct.Ch. Div., 101 N.J.Super. 334, 244 A.2d 328 (1968), *aff'd per curiam,* N.J.Super.Ct.App. Div., 104 N.J.Super. 154, 249 A.2d 18 (1969); Smith, 56 B.U.L.Rev. at 550. Thus, we abandon the more restrictive standard implied by *Westminster,* 343 A.2d at 606.

For the foregoing reasons the order of the Court of Chancery is reversed and the matter is remanded to that court for further proceedings consistent herewith.

\*    \*    \*

REVERSED AND REMANDED.